UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br><br>                Plaintiff,<br><br>     v.<br><br>Algernon Tamasoa,<br><br>                Defendants. | No.  2:15-cr-0124-KJM<br><br>ORDER |

1        Algernon Tamasoa moves for an order reducing his sentence to time served under

2  18 U.S.C. § 3582(c)(1)(A).  He contends he suffers from medical conditions that put him at

3  greater risk of serious COVID-19 symptoms.  *See* Mot., ECF No. 258.  He is currently

4  incarcerated at FCI Big Spring in Texas, a low-security prison, which is recovering from a severe

5  COVID-19 outbreak.[1]  The government opposes his motion, arguing Mr. Tamasoa's weight and

6  height are unverified and the § 3553(a) sentencing factors weigh against granting his motion.  *See*

7  *generally* Opp'n, ECF No. 262.  Mr. Tamasoa verified his medical conditions with his reply brief.

---

[1] Bureau of Prisons, "COVID-19 Cases," available at https://www.bop.gov/coronavirus/ (visited Nov 12, 2020) (reporting 3 deaths, 6 incarcerated people with COVID-19, and 714 individuals "recovered").  At the time of Mr. Tamasoa filed his motion, 211 incarcerated people had COVID-19 and 392 people had "recovered."  ECF No. 258 at 6.

1

Reply, ECF No. 264.  Both parties have submitted medical records, which they request be sealed. ECF Nos. 259, 263.  The court grants the requests to seal and finds Mr. Tamasoa's increased risk of severe COVID-19 symptoms, his reasonable release plan, his compliance with pre-trial release conditions, the absence of a prior criminal history and the severity of the outbreak at FCI Big Spring all weigh in Mr. Tamasoa's favor.  As explained in more detail below, the motion is granted.

**I.      BACKGROUND**

Mr. Tamasoa participated in a conspiracy to purchase methamphetamine in Northern California and to distribute it in Hawaii.  *See* Plea Agreement Ex. A at A-1.  According to the factual basis of his plea agreement, he spoke with a codefendant about mailing 438 grams of methamphetamine, went with another co-conspirator to a FedEx store to mail one pound of methamphetamine, and sent two text messages about the status of the package.  *Id.* at A-1 to A-2. He also sold eleven firearms to an undercover officer over a four-month period, and officers found two firearms in his home while executing a search warrant.  *Id.*  He pleaded guilty to conspiracy to distribute and possess with intent to distribute methamphetamine, and also to dealing firearms without a license.  *See* Plea Agreement at 2, ECF No. 98.

Mr. Tamasoa was released on bond before trial.  For fifteen months, he "complied with all court-ordered conditions of release," including abstaining from possession of a firearm or dangerous weapon, submitting to random drug and alcohol tests, refraining from communicating with any co-defendants, and restricting his travel to the Eastern District of California.  *See* Special Conditions of Release, ECF No. 57; Presentence Report at 5, ECF No. 141.  His compliance with these conditions enabled him to attend a family wedding in another state and to celebrate his nephew's graduation after curfew, as agreed to by stipulation between the government and defense counsel, and approved by a magistrate judge of the court.  *See* ECF No. 73; ECF No. 77. On June 7, 2017, the court sentenced Tamasoa to 97 months' imprisonment and 36 months' supervised release.  ECF No. 165.  As noted, he is serving his sentence at FCI Big Spring in Texas. At the time Mr. Tamasoa filed his motion, Big Spring had 211 COVID-19 positive

incarcerated individuals. ECF No. 258 at 6. Currently, 714 incarcerated individuals have been deemed "recovered" by the Bureau of Prisons, more than 70 percent of the population of the institution.[2] Mr. Tamasoa has completed not quite half of his term of incarceration. *See* Opp'n at 12.

Mr. Tamasoa moves for compassionate release in light of his medical conditions. ECF No. 258. At the time of his sentencing and incarceration in 2017, his body mass index was higher than 40, Medical Records Ex. 2 at 65, ECF No. 262 , which places him within a group the CDC has found to be at higher risk of severe illness from COVID-19.[3] More current medical records[4] show he struggles with breathing issues, some numbness and headaches as well as a blood pressure reading of 130/87, Medical Records at 7; the blood pressure reading is consistent with stage 1 hypertension, Ex. E, ECF No. 258. Current medical records do not report his current height and weight, but in a declaration signed under penalty of perjury and attached to his reply brief, Mr. Tamasoa attests he recently weighed over 330 pounds. Ex. G at 2, ECF No. 264. At 6 feet 2 inches, Presentence Report, ECF No. 141 at 3, and 330 pounds, Ex. G at 2, Mr. Tamasoa's BMI is 42.4,[5] placing him in a category of people found to be at a higher risk of severe illness from COVID-19 due to "severe obesity."[6]

---

[2] Bureau of Prisons, "COVID-19 Cases," *available at* https://www.bop.gov/coronavirus/ (visited Nov. 10, 2020) (reporting 3 deaths, 714 individuals "recovered").

[3] *See* U.S. Centers for Disease Control, "People with Certain Medical Conditions" (updated Oct. 16, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity, last visited Oct. 30, 2020 [hereinafter People with Certain Medical Conditions] ("having obesity, defined as a body mass index (BMI) between 30 kg/m2 and <40 kg/m2 or severe obesity (BMI of 40 kg/m2 or above), increases your risk of severe illness from COVID-19.")

[4] The court grants the request to file this exhibit under seal to protect Mr. Tamasoa's private medical information. *See Chester v. King*, No. 16-01257, 2019 WL 5420213, at *2 (E.D. Cal. Sep. 10, 2019) ("This court, and others within the Ninth Circuit, have recognized that the need to protect medical privacy qualifies as a 'compelling reason' for sealing records.").

[5] *See* U.S. Centers for Disease Control, "Adult BMI Calculator," (updated Sept. 17, 2020), *available at* https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html, last visited November 10, 2020.

[6] *See* People with Certain Medical Conditions, *supra* note 3.

## II. LEGAL STANDARD

A sentencing court has authority to modify a term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). Under that statute, as amended by the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), the court may grant a defendant's motion to reduce his term of imprisonment, provided the defendant has first satisfied an exhaustion requirement, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," if "extraordinary and compelling reasons warrant such a reduction," and if "a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A), 3582(c)(1)(A)(i).

Many years ago, before the First Step Act and before defendants could move to reduce their sentences under § 3582, the Sentencing Commission issued a policy statement addressing what qualifies as "extraordinary and compelling reasons" under § 3582. *See* U.S.S.G. § 1B1.13. The same Guidelines section also "imposes an additional consideration of whether the defendant is a danger to the safety of any other person or to the community." *United States v. Numann*, No. 16- 00025, 2020 WL 1977117, at *2 (D. Alaska Apr. 24, 2020) (citing U.S.S.G. § 1B1.13(2)). Since the First Step Act was passed, district courts have disagreed about whether the Sentencing Commission's statement is binding, as this court has summarized in previous orders. *See, e.g.*, *United States v. Terraciano*, No. 17-00187, 2020 WL 5878284, at *2–3 (E.D. Cal. Oct. 2, 2020). This court has looked to the Sentencing Commission's policy statement as guidance in several previous orders and will do the same here. *See, e.g.*, *id.*; *United States v. Schweder*, No. 11-00449, 2020 WL 5257598, at *3 (E.D. Cal. Sept. 3, 2020).

## III. DISCUSSION

The government does not dispute that Mr. Tamasoa has satisfied the exhaustion requirement of § 3582(c). *See* Opp'n at 5. The court thus considers (A) whether Tamasoa has demonstrated his motion is supported by extraordinary and compelling reasons and (B) whether applicable sentencing factors of § 3553(a) weigh in favor of his motion.

4

**A.     Extraordinary and Compelling Reasons**

Tamasoa's severe obesity increases the risk he would suffer a more severe case of COVID-19 if infected.  District courts within the Ninth Circuit have recognized obesity greatly increases the risk of serious COVID-19 symptoms and complications and have granted motions for compassionate release to inmates with a body mass index within the "obese" range. *See, e.g.*, *United States v. Richardson*, 2020 WL 3402410, at *3 (E.D. Cal. June 19, 2020) ("obesity alone" places a defendant "at higher risk of COVID-19 complications"). The government does not disagree.  Opp'n at 8.

While the government concedes obesity may be a "serious" comorbidity, it argues Tamasoa's more recent medical records do not report his current body mass index.  Opp'n at 8-9. The government also notes three cases from districts outside of this Circuit in which courts have declined to consider a defendant's claim of obesity without evidence of the defendant's current height and weight. Opp'n at 8-9.  In each of these three decisions, the defendants had BMIs lower than Tamasoa's. *See, e.g.*, *United States v. Wright*, No. 17-20334, 2020 WL 5906706, at *2 (E.D. Mich. Oct. 6, 2020) (defendant's BMI was 37.6 and defendant did not mention his obesity until his reply brief and then only briefly); *United States v. Goston*, No. 15-20694, 2020 WL 5993235, at *2 (E.D. Mich. Oct. 9, 2020) (defendant had a BMI of 30); *United States v. Neal*, No. 2:08-CR-00628-JMG-5, 2020 WL 5993290, at *5 (E.D. Pa. Oct. 9, 2020) (defendant's BMI of 29 fluctuated and at times rose above 30). Here, by contrast, all evidence points to one conclusion: that Mr. Tamasoa's body mass index places him at high-risk.  This conclusion is supported by his height of 6 foot 2 inches, Presentence Report, ECF No. 141 at 3, and his weight as provided in the declaration written under penalty of perjury, that he recently weighed over 330 pounds.  Ex. H at 3, ECF No. 264.

Additionally, Mr. Tamasoa claims he suffers from stage 1 hypertension.  ECF No. 258 at 14.  While the government points to one of Mr. Tamasoa's medical records for 2017 as noting hypertension "denied," Opp'n at 9, Mr. Tamasoa's blood pressure on August 10, 2020 was measured as 130/87. Ex. 2 at 7, ECF No. 262. This qualifies as "high blood pressure" meaning

1   the patient has "hypertension."[7] Courts have found that hypertension alone increases the risk of
2   severe COVID-19 symptoms and thus have granted motions for compassionate release to
3   defendants with hypertension. *See, e.g., Richardson*, 2020 WL 3402410, at *3.  The government
4   argues Mr. Tamasoa's submission of one blood pressure reading is insufficient to substantiate his
5   claim of hypertension.  Opp'n at 9.  In light of the most recent reading, and the absence of any
6   further medical documentation or medical expert opinion, the court finds Mr. Tamasoa has
7   demonstrated he likely suffers from hypertension, which by itself would support granting a
8   motion for compassionate release.  *See, e.g.*, *United States v. Terraciano*, No. 17-00187, [2020
9   WL 5878284, at *4] (collecting cases).  While this condition appears to weigh in favor of Mr.
10  Tamasoa, even if it did not the court could and would grant his motion based on his obesity and
11  BMI.

12       Mr. Tamasoa also argues a history of diabetes in his family puts him at greater risk of
13  severe COVID-19.  ECF No. 258 at 10.  That may be so, but in this respect he does not support
14  his argument with citations to medical authority or expert opinion.  The court thus declines to
15  give weight to his argument regarding family history.

16       Nevertheless, Mr. Tamasoa's documented medical condition places him at higher risk of
17  severe illness from COVID-19, considering the COVID-19 outbreak FCI Big Spring has
18  experienced.  Other courts within this Circuit have granted motions for compassionate release to
19  defendants housed in facilities within FCI Big Spring,[8] citing significant COVID-19 outbreaks.
20  *See, e.g., United States v. Patrick Tables,* No. CR18-16 TSZ, 2020 WL 6196389, at *2 (W.D.
21  Wash. Sept. 2, 2020) (granting compassionate release when number of incarcerated people at Big
22  Spring infected with COVID-19 was at 69).

---

[7] *See* U.S. Centers for Disease Control, "High Blood Pressure," (updated May 19, 2020), *available at* https://www.cdc.gov/bloodpressure/about.htm, last visited November 10, 2020.

[8] FCI Big Spring is a low-security prison that houses both a minimum-security camp and a prison.  Bureau of Prisons, "FCI Big Spring," *available at* https://www.bop.gov/locations/institutions/big/index.jsp (last visited Nov. 11, 2020). Neither the government nor defense specify in which facility Mr. Tamasoa resides, but as both parties use the term "FCI Big Spring" this court presumes he resides in the federal correctional institution, not the camp.

1    Through his counsel, Mr. Tamasoa reports he is housed in a "in a 3-room, open dorm
2 facility" at Big Spring where 40 incarcerated persons share 20 bunk beds. Ex. H at 2, ECF No.
3 264.  Persons in the dorms are not consistently wearing masks. *Id.* The CDC's Guidance for
4 Correctional & Detention Facilities notes that the circumstances in these facilities present "unique
5 challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and
6 visitors," with the observation that "[c]onsiderations when assessing close contact include the
7 duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical
8 symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does
9 exposure to a severely ill patient)." Moreover, "[c]ontact tracing may be more feasible and
10 effective in settings where incarcerated/detained individuals have limited contact with others
11 (e.g., celled housing units), compared to settings where close contact is frequent and relatively
12 uncontrolled (e.g., open dormitory housing units)."[9] Some courts have concluded, and this court
13 has agreed, that "[t]he danger of COVID-19 to high-risk individuals who are imprisoned is likely
14 much greater than to those who are free to take their own protective measures."  *United States v.*
15 *Esparza*, No. 1:07-CR-00294-BLW, 2020 WL 1696084, at *2 (D. Idaho Apr. 7, 2020) (footnote
16 omitted); *see also United States v. Kabiljagic*, No. 2:14-CR-00021-KJM, 2020 WL 5905359, at
17 *4 (E.D. Cal. Oct. 6, 2020) (so finding).  Taken together, the high risk of infection at FCI Big
18 Spring and Tamasoa's health conditions are extraordinary and compelling reasons to grant his
19 request under § 3582(c).

20   **B.   Section 35553(a) Sentencing Factors**

21   A Sentencing Commission policy statement instructs "the court [to] consider the
22 sentencing factors set forth in 18 U.S.C. § 3553(a) when deciding a motion for compassionate
23 release, and the [c]ourt should not grant a sentence reduction if the defendant poses a risk of
24 danger to the community, as defined in the Bail Reform Act."  *United States v. Gonzalez*, 451 F.

---

[9] *See* U.S. Centers for Disease Control, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," (updated Oct 21, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html, last visited November 10, 2020.

1  Supp. 3d 1194, 1197 (E.D. Wash. 2020), at *3 (citing U.S.S.G. § 1B1.13);[10] *see also* 18 U.S.C.
2  § 3582(c)(1)(A). The sentencing factors include, among others, (1) "the nature and circumstances
3  of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence
4  imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to
5  provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct;
6  (C) to protect the public"; and "(D) "the need to avoid unwarranted sentence disparities among
7  defendants with similar records who have been found guilty of similar conduct." 18 U.S.C.
8  § 3553(a).

9  There can be no dispute that Mr. Tamasoa's offenses were serious.  The quantity of drugs
10 he assisted in selling and the number of firearms he sold without a license weigh against granting
11 his motion, but not so heavily as to overcome other factors that weigh in his favor. He has no
12 prior criminal history. Presentence Report at 11. He played only a minor role in the drug
13 conspiracy and was less culpable than his co-defendants. *Id.* at 14.  Although Tamasoa sold
14 firearms without a license, he accepted responsibility for that crime and did not use or wield any
15 weapons in furtherance of his crimes. *Id.* at 9; *see United States v. Beck,* 425 F. Supp. 3d 573, 574
16 (M.D.N.C. 2019) (granting motion for compassionate release to individual charged with dealing
17 12 firearms in connection with drug offense because no evidence she ever wielded or pointed gun
18 at anyone). He also complied with the conditions of his lengthy pretrial release, which bodes well
19 for his ability to comply with his conditions of supervised release.

20 The court recognizes Mr. Tamasoa does not have a completely clean prison record. In
21 2018, Mr. Tamasoa was found with a phone in his bunk bed. Ex. C, ECF No. 262. The phone is
22 the "hazardous tool" the government points too in arguing dangerousness. The government also
23 alleges Mr. Tamasoa is currently in administrative detention as a result of destroying property
24 over $100. ECF No. 262 at 11. No records provided support this contention. Mr. Tamasoa,

---

[10] This court has previously found U.S.S.G. § 1B1.13(1)(C)(i) is not binding after the passage of the First Step Act, but the court still considers it guidance in deciding COVID-19 compassionate release cases.  *See United States v. Bradley*, No. 2:14-cr-00293-KJM, 2020 WL 3802794, at *2–3 (E.D. Cal. July 7, 2020).

1 through counsel, explains the property damage occurred when Mr. Tamasoa, who clearly is a
2 large man, leaned against a window. ECF No. 264 at 7. Counsel represents he is paying to have
3 the window repaired. *Id.* Even taking account of these matters, neither reflects Mr. Tamasoa has a
4 violent nature or has committed acts of violence in the prison. Neither overcomes the factors that
5 weigh in his favor.

6       Regarding Mr. Tamasoa's firearms conviction offense, while few courts have tackled the
7 issue, at least one court has held that dealing firearms without a license, under 18 U.S.C.
8 § 922(a)(1)(A), is not a crime of violence. *United States v. Carter*, 996 F. Supp. 260, 264
9 (W.D.N.Y. 1998). Moreover, it appears no court has found the offense of dealing firearms
10 without a license is a crime of violence. *See id.* The underlying facts of this case do not
11 demonstrate that Mr. Tamasoa displays attributes of dangerousness. *See* Plea Agreement at 2, 12-
12 14. Mr. Tamasoa sold eleven firearms to an undercover officer, a serious offense, but did so
13 without making threats or engaging in any violent act. *Id.* Additionally, Mr. Tamasoa has no prior
14 criminal history, Presentence Report at 19, and BOP assigned him a low pattern risk score.  Ex. A
15 at 5, ECF No. 258.  Overall, Mr. Tamasoa does not pose a danger to his community.

16       Mr. Tamasoa's release plan also supports his request.  He proposes to live with his wife
17 and their two children, as he did during his pretrial release, under the supervision of the U.S.
18 Probation Office. Reply, ECF No. 264 at 7.  His wife will be able to provide health insurance
19 through her employment at Kaiser Permanente.  *Id.*  The supervised release conditions the court
20 has already imposed include participation in mental health treatment programs, abstention from
21 alcohol and drugs, and participation in an outpatient substance abuse program; these conditions
22 address contributors that appear to have underlain Mr. Tamasoa's criminal conduct.  *See*
23 Presentencing Report at 9 (noting alcohol abuse and depression following father's death).  The
24 court has conferred with its Probation Office, which will supervise Mr. Tamasoa if he is released.
25 That office has confirmed Tamasoa's release plan is acceptable.

26       Given all of the factors reviewed above, the court reduces Mr. Tamasoa's sentence to time
27 served.  The government has requested an opportunity to brief appropriate release conditions,
28 including a release plan and a period of home confinement, but Mr. Tamasoa's release plan has

been reviewed for the court by Probation, thus this request is DENIED. *See United States v. Scparta*, No. 18-578, 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020). The court does order Tamasoa to self-isolate for fourteen days in his residence.

## IV.   CONCLUSION

The parties' requests to file documents under seal, *see* ECF No. 259 and 263, are granted.

The motion for compassionate release, ECF No. 258, is granted.

The court modifies defendant's previously imposed sentence of incarceration of 97 months to time served. In addition to other court-imposed conditions of release, defendant's previously imposed conditions apply and movement in the community shall be restricted as follows, with all activities subject to pre-approval by the probation officer: defendant shall be restricted to his residence at all times except for employment, education, religious services, medical, substance abuse or mental health treatment, attorney visits, court appearances, court-ordered obligations, or other activities as pre-approved by the probation officer.

The court ORDERS Mr. Tamasoa to self-isolate for fourteen days in his father's home once he arrives there, as a means of protecting his health and that of the others residing in the home while also complying with all applicable public health orders.

There being a verified residence and an appropriate release plan in place, this order is stayed for up to seven days to make appropriate travel arrangements and to ensure the defendant's safe release. The defendant shall be released as soon as appropriate travel arrangements are made and it is safe for the defendant to travel. There shall be no delay in ensuring travel arrangements are made. If more than seven days are needed to make appropriate travel arrangements and ensure the defendant's safe release, then the parties shall immediately notify the court and show cause why the stay should be extended.

This order resolves ECF Nos. 258, 259, 263.

IT IS SO ORDERED.

DATED: November 12, 2020.

_____
CHIEF UNITED STATES DISTRICT JUDGE